UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA         :         Docket No.: 13-CR-950 (JMF)

                                 :

          - against -            :

                                 :

GARY DAVIS,                      :

                                 :

               Defendant.        :

------------------------------------------------------x


**SENTENCING MEMORANDUM
ON BEHALF OF GARY DAVIS**


MARC AGNIFILO
 JACOB KAPLAN
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue, 26th Floor
New York, New York 10017
(212) 750-7800

BRIAN KLEIN
BAKER MARQUART LLP
777 S. Figueroa St., 28th Floor
Los Angeles, California 90017
(424) 652-7800


*Attorneys for Gary Davis*

# TABLE OF CONTENTS

I.    Preliminary Statement ................................................................................................1

II.   Introduction ..............................................................................................................2

III.  Individualized Assessment of Gary Davis .................................................................3

      A.    History and Characteristics of Gary Davis ......................................................3

            1.    ███████████████████████████ ...............................3

            2.    Gary's Mental Health Issues and Substance Abuse ..............................5

            3.    Gary's Impact on the Lives of His Family Members ...........................6

            4.     Gary's Kindness Is Not Limited to His Family .................................9

            5.    Gary Has Made Extremely Productive Use of His Time While
                  Incarcerated .......................................................................................13

      B.    Nature and Circumstances of the Offense .....................................................14

            1.    Gary's Misconduct ............................................................................14

            2.    Gary Accepted Responsibility and Is Deeply Remorseful for His
                  Conduct .............................................................................................15

IV.   Analysis ..................................................................................................................16

      A.    The Sentence Guidelines in This Case Overstate the Degree of Gary
            Davis' Culpability ........................................................................................16

      B.    Sentencing Parity Supports a 30-Month Sentence .........................................18

      C.    Other Sentencing Considerations ..................................................................19

V.    Conclusion ..............................................................................................................21

## TABLE OF AUTHORITIES

### Cases

United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)..............................................17

United States v. Behr, No. S1 03CR1115-02 (RWS), 2006 WL 1586563
(S.D.N.Y. June 9, 2006) ........................................................................................................20

United States v. Booker, 543 U.S. 220 (2005)........................................................................16

United States v. Mendola, 03-CR-449 (KMW) (S.D.N.Y. 2005) ............................................20

Nelson v. United States, 555 U.S. 350 (2009)........................................................................17

### Statutes

18 U.S.C. § 3553(a)(1).....................................................................................................*passim*

U.S.S.G. § 2D1.1(b)(7) .........................................................................................................17

U.S.S.G. § 2D1.1(c)(2).........................................................................................................17

U.S.S.G. § 3E1.1(a), (b) .......................................................................................................17

### Other Authorities

Kate Stith & José A. Cabranes, Fear of Judging: Sentencing Guidelines in
the Federal Courts, 69 (1998)................................................................................................17

## I.     PRELIMINARY STATEMENT

This is one of those cases where we are especially grateful that the Supreme Court has freed each trial judge to do that which the judge thinks is appropriate in the individual case and for the individual person standing before the Court. Though the Guidelines in this case are severe, we advance what we hope are principled reasons for this Court varying from them. Moreover, while Mr. Davis' association with the Silk Road is contemptible, we offer what we hope are equally principled reasons for the Court to show appropriate leniency given Gary's well-established and substantial psychological and emotional challenges which, we contend, contributed to his commission of the offense.

We hope that the Court will agree, after studying the probation report, this memorandum, the letters, as well as the government's submissions, that Gary deserves a sentence that is consistent with his individual degree and type of culpability.  We believe, and we respectfully submit, that an appropriate sentence under 18 U.S.C. § 3553(a) is a sentence of 30 months of incarceration. In this memorandum, we will discuss the fact that Gary has been diagnosed with ███████████ because the facts show that his emotional and psychological makeup played a role in his commission of this offense, which he was able to do from the comfortable anonymity of a computer terminal without having to venture into a world that, quite frankly, frightens him. We will also discuss his



particular role in the Silk Road and how this should result in a downward variance in the guidelines calculation.

## II.   <u>INTRODUCTION</u>

Gary Davis had a childhood that was both happy and difficult. Uncomfortable in social settings, Gary had a difficult time making friends. As a result, he was bullied in elementary school and always felt alone. It was not until years later that Gary learned his social issues during childhood were caused by ███████████████████████████████████████████████████ ███████████   The only time that Gary felt comfortable was when he was in front of the family computer. As a young child, Gary became obsessed with the computer (another symptom of Gary's disorder) to the point where he would soil himself rather than walking away from the computer to use the bathroom.

Gary's social issues continued through adulthood and were coupled with bouts of ████████. The co-existence of █████████████ and ████████ is not unusual, especially during teenage years when children begin to realize that they are different from their peers, increasing both their struggle and their isolation. ██████████████████████████████ ██████████████████████████████████   Years of drug use and a menial job at his father's factory followed. It was not until 2013, at the age of 25, that Gary found that same comfort level he had as child in front of the computer. The computer was a form of sanctuary for Gary, a place where he could interact with the world outside and be almost social, while at the same time remaining safe from real world unpredictability.

However, his comfortable computer activity at the age of 25 regrettably took the shape of a forum monitor on the Silk Road website—an online marketplace that sold illegal items. This role allowed him to interact with others without the need for face-to-face communications (which he had always struggled with). After Gary excelled at this role for a month, the head of Silk Road hired him

as a site administrator. Again, this new role allowed Gary to interact with others from behind his computer screen. Gary worked as a site administrator for about three-and-a-half months in 2013 (mid-June to October 1) before the site was shut down by law enforcement.

It is for his conduct at Silk Road—from mid-May to October 1, 2013—that Gary has been extradited from Ireland, detained in the Metropolitan Correctional Center for nearly 9 months and is now facing sentencing, as a non-violent-first-time offender, for conspiracy to distribute narcotics. Gary accepts full responsibility for all his serious misdeeds that have him before this Court and is deeply remorseful. He only wishes to return home to Ireland as soon as possible to return to his life there.

### III.   INDIVIDUALIZED ASSESSMENT OF GARY DAVIS

Pursuant to 18 U.S.C. § 3553(a)(1), the Court "should consider the nature and circumstances of the offense and the history and characteristics of the defendant" before arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing. The latter considerations are addressed by: (1) a brief overview of Gary's mental health and substance abuse; and (2) the words and voices of the many people who have come forward to write the Court letters on Gary's behalf his many admirable qualities and prior good deeds.

### A.   HISTORY AND CHARACTERISTICS OF GARY DAVIS

**1.**   ███████████████████████████

Gary was born in Ireland in 1998 as the youngest of five children to John and Jenny Davis. (PSR ¶ 107.) Gary grew up with modest means as his mother was a homemaker and his father was a self-employed precision tool maker. (Id. ¶¶ 107, 109.)

Gary had difficulty in social situations from an early age. This led to him having few friends as a child and being bullied at school. It was not until 2014 that Gary discovered that his social issues

were a result of ███████████ █ In making this diagnosis, Professor Michael Fitzpatrick

noted:



(Ex. 2: Prof. Michael Fitzpatrick Report at 1.)

Gary's diagnosis was confirmed a year later by Simon Baron-Cohen, Professor of

Development and Psychotherapy at Trinity College in the United Kingdom. In coming to this

diagnosis, Professor Baron-Cohen relied, in part, on information he received from Gary's sister

Natalie ███████████ ████████



(Ex. 3: Prof. Simon Baron-Cohen Report at 1.)

Both Professors Fitzpatrick and Baron-Cohen also relied on Gary's obsessive behavior in

making their diagnosis, noting how Gary became increasingly obsessed with the family's computer

to the point where he would soil himself rather than walking away from the computer. As Professor

Baron-Cohen notes: "[Gary] would soil himself whilst he was on his computer because he was so

obsessed with it he couldn't stop to go to the bathroom. He developed scabs on his legs through

---



soiling himself." (<u>Id.</u> at 1; <u>see also</u> Prof. Michael Fitzpatrick Report at 1 ("He has narrow interests, obsessed with computers, so much that growing up he would soil himself rather than go to the toilet because he was so fixated on the computer.") Gary's obsessive behavior also infected daily tasks in his life such as needing to wipe his feet every night before bed and needing to finish a book or a game once he started it. (Prof. Simon Baron-Cohen Report at 2.)

Another area where Gary's obsessive nature took root was Bitcoin. As Gary explained: "I became obsessed with Bitcoin. I had "mining" equipment to compute cryptographic algorithms. You have to configure the programs. I buil[t] two "rigs," involving installing 4 to 6 graphics cards on a motherboard. I was trading in bitcoin, which is a volatile currency, but making a living from trading." (Prof. Simon Baron-Cohen Report at 3.)

### 2.  Gary's Mental Health Issues and Substance Abuse



In additional to ███████████, Gary also suffered from ██████ since the age of 14. (PSR ¶ 117.) ████████████████████████████████████████████

████████████████ (<u>Id.</u> ¶ 118.) About two years later (2008), Gary's ██████ deepened as he suffered through a traumatic episode when the neighbor of one of his friends hanged himself in his stable and Gary helped cut down the body. (<u>Id.</u> ¶ 119.) Gary had another ████████████ in 2011 when his brother-in-law that he was extremely close with committed suicide by hanging. (<u>Id.</u> ¶ 121.) Unfortunately, Gary never sought treatment for his ██████ growing up because "mental health treatment is considered 'taboo' in Ireland." (<u>Id.</u> ¶ 118.) In 2014, Professor Fitzpatrick diagnosed Gary with ████████████████████████████████████████

██████ (Ex. 2: Prof. Michael Fitzpatrick Report at 1.)

Compounding his mental health issues, Gary started using alcohol at 12 years old, with it getting "'out of hand'" when he was 18 years old. (PSR ¶ 123.) Gary also started smoking marijuana when he was 18 years old (intermittently) and using cocaine when he was 28 years old (.5 gram daily

and 4-5 grams on weekend binges). (Id. ¶ 125.) His drug use increased in 2016—including ecstasy and valium—as he used it to escape the stress of the extradition process. (Id. ¶¶ 125-126.)

**3.      Gary's Impact on the Lives of His Family Members**

Gary's immediate family members have written heartfelt letters that show the Court that Gary is the family member who is always there for everyone else, even while dealing with loss or struggles of his own. Though Gary's immediate family all live within 4 miles of his parents' home, Gary lived with his parents until he was incarcerated in Ireland for six weeks prior to his extradition. Gary's mother writes of his absence while incarcerated in this case: "I cannot adequately describe the pain and loneliness I feel since he's been gone from our home." (Ex. 4: Letter of Jenny Brandon-Davis at 1.) Her letter presents the fullest picture of who he is:

> I understand the seriousness of the charge that Gary has pleaded guilty to, and I know that he is very remorseful, but this does not define who he is and we love and respect him for who he truly is. The number of people that have contacted us to let us know how much he has helped, changed and enriched their lives over the years is astonishing[.]  We always knew how kind-hearted, caring, loving, well mannered and empathic he is. He has done numerous good deeds for his neighbours, friends and family. He is a tower of strength to everyone….
>
> For example[,] when our daughter was widowed at age 36 in 2011, even though he was grieving too, as we all were, he helped her out every day with her 4 children (all boys) aged from 5-12 years. We are still mourning for our daughter and grandchildren, who have had to grow up without their beloved father. He also lost his very close 1st cousin (my niece) Jenna, age 29 from breast cancer a year later. The loss of his Grandmother (my Mother) 4 years ago also impacted on him, as they were very close. When he was 18 he had to cut down a suicide while assisting a medic. This affected him quite badly, as he was so young. He has always given freely of his time to everyone and also took great care of his pet cat Guinness. Gary has no enemies, is a pacifist and a naturist, has never been in conflict with anyone and has never been violent, he has the support of everyone who knows him.

(Id.)

Gary's father John is equally supportive and eager to welcome Gary back home. Mr. Davis confirms that after his son-in-law's suicide, Gary was the person who pulled the entire family through their grief, helping his sister quietly but consistently, with love and support and without

judgment, stepping in to fill a void that his brother-in-law left for his nephews, and helping the

whole family despite his own grief:

> Gary was always a quiet boy growing up, and would never mention anything about
> the help or kindness he showed to people which were many. My son-in-law Rory
> took his own life in 2011 and left my eldest daughter Natalie with four young boys.
> The help that Gary gave to Natalie in her darkest hour was outstanding and made me
> a very proud father. He stayed with her overnight for the months after, brought the
> boys to school and gave them advice, listening to what they had to say about their
> Dad Rory, and never judging his illness of ███████ It was a very hard time in our
> lives. Gary helped us all through this terrible time with his kindness and support.

(Ex. 5: Letter of John Davis at 1.)

> Gary's sister Natalie elucidates further on Gary's impact on her and her sons' lives:

> Despite his own grief Gary became a pillar of strength to me. He came to help every
> single day for almost a year and regularly thereafter.  He stayed overnight and helped
> get his 4 nephews up and dressed for school, giving them breakfast and making their
> school lunches. Much of the first year after my husband's death is a blur but I
> remember Gary being a constant source of help and support to me.  He helped the
> children after school with homework too and often helped to prepare meals when I
> just couldn't do it.

> Gary developed a great bond with his 4 nephews and despite knowledge of his
> wrong doings, they still look up to and admire him a lot.  He has supported them
> through almost 8 years without their Dad. Luke and Keith in particular seek his
> guidance and he has been a very positive influence in their lives. . . . I know Gary has
> remorse and regret for his part in this crime.  I am still very proud he is my brother.
> Gary has always shown great kindness and willingness to help out on a practical level
> and also to support myself and his nephews in any way he can.

(Ex. 6: Letter of Natalie Davis at 1.)

While Gary's role in his family members' lives after the loss of his brother-in-law stands out

among many stories, it is far from the only way he has contributed to their lives, and all the more

remarkable in light of his own mental health struggles. His sister Rachael runs her own small

business; she describes how Gary not only set up the IT for her business—setting up all the

computer based systems, and helping with her website and the securing of her clients' details on her

system—but also "spent his free time helping me to get my business off the ground and with my

two small children at home, his time and energy was greatly appreciated." (Ex. 7: Letter of Rachael

Davis Kearns at 1.) She further notes how "Gary was always at the end of the phone willing to help" and that she is "feeling a little lost without him for support and guidance." (Id.)

> Gary has shown the same kind of selfless help to his final sister, Julie, who writes,
>
> As a working Mum, Gary has helped me endlessly over the years, always willing to help me out with my children. They love spending time with him, as he shows a genuine interest in what they're doing in school and with their friends.  I never hesitate in asking him for help with them, as he is always forthcoming, and always answers my thanks with 'anytime at all Ju'. Everyone's life is so busy these days, but he never once declined when I asked him to mind the children for me.  He changed his plans many times to help me, and never makes me feel indebted to him.
>
> His generosity with his time has also shown with helping me in the Salon.  He set up and maintained our computer booking system and merchant terminal and music system and is always my first port of call with any technical issues we have!  He gladly helps me out, never expecting anything in return.

(Ex. 8: Letter of Julie Davis at 1.)

Gary's generosity of time and spirit seems boundless. One thing is abundantly clear: he goes out of his way to be there for his family members, without expecting anything in return, simply because that is who he is. Gary's only brother, Jonathan, confirms Gary's tendency to put others before himself, and just how much of a shock it was when the allegations in this case came to light:

> Gary has always been the one to put others before himself, especially those less fortunate, or those in a less fortunate position than him.  He is genuinely the most caring, loving person you could meet, I am positive that this will come across in the letters of support for him that you receive. The saying "not a bad bone in his body" [w]as made to describe people like my brother. When the revelations of this case came to light, to say it was a shock to myself, my family and his nearest and dearest is a severe understatement. However despite this, and taking into account the impact that the last few years has had on our family, my thoughts and feelings for Gary remain the very same; he is still that genuine, caring and loving person to me and all that know him.

(Ex. 9: Letter or Jonathan Davis at 1.) Despite the shock and disappointment, Jonathan, like his other family members, remains completely supportive of Gary and recognizes that Gary has a support network in Ireland ready to welcome him home and help him on a new path once he is released. He seeks to assure the Court that Gary will be able to find work:

> There is a support network in place for Gary in Ireland. In my position as a General Manager for Compass Group Ireland, I will ensure to find a place of work for Gary. There are numerous colleagues of mine who have got to know Gary through the years who would be only too happy to give him an opportunity also. They know Gary, they would trust him, and he would not let them down. Prior to Gary leaving Ireland, he had a steady job and his employers were extremely supportive of him, despite knowing the facts of this case. He had changed his life.

(Id.)

It may be expected to have played an important role in one's immediate family, but Gary's kindness and generosity did not stop there. His younger cousin Anouska Proetta Brandon describes Gary as always feeling "like my second big brother"; she described two instances where Gary's effort and compassion truly impacted her:

> One moment where he really showed his generosity and kindness toward me that has always stuck with me was when I was 18 years old. I had been nominated for an award within the fashion industry and wanted to get a nice outfit and shoes, however I couldn't afford much so I was going to wear some hand-me-downs. When he heard this he took me shopping to make sure I felt and looked and felt really good about myself because he knew this was an important event for me. He didn't ask for anything in return, he just wanted to make sure I was happy. He did not have to do this, however it is not unlike Gary to go above and beyond for the people he loves….
>
> He has been there for me for so many big parts of my life, for example I had a bad break up so to cheer me up he told me to get dressed and he was going to take me out dancing. He didn't have to say or do anything, just knowing he cared enough to invite me out with his friends who I had never met because I needed cheering up was enough to feel loved and wanted.

(Ex. 10: Letter of Anouska Proetta Brandon at 1.) Gary understands that it is so often the small kindnesses and effort that change people's lives, and he makes those efforts with everyone in his life.

### 4. Gary's Kindness Is Not Limited to His Family

Gary's generosity and care for others is not limited to his family. His friends tell compelling stories of how he has been there for them in ways large and small. A childhood acquaintance observed: "Gary sees the lonely, quiet people; he forms a bond, he remembers, he supports, he listens, he cares, he encourages and he believes in them. Without Gary, I do often wonder who of

these friends, and countless others, would still be here with us living full, whole lives, content and positive and giving back to society." (Ex. 11: Letter of Emma Mitchell at 1.)

A significant example of how Gary helped and inspired people was through his heroic efforts while still in high school to help not a friend, but the friend's parent and their neighbor, through a tragic event. As Valerie Pfeiffer, the friend's mother, tells the story:

> On June 14th[,] 2006 my neighbor's wife telephoned me to say she couldn't reach her husband and was concerned. I immediately went to the house and as I entered I discovered he had taken his own life. This was extremely shocking and upsetting for me as you can imagine. I was alone and needed to get help so after calling 911 I ran into the road. I asked some passersby to help but nobody was willing. My daughter had some friends over and Gary was one of them. He immediately insisted to come with me. He stayed with me until the paramedic arrived and then assisted him also.
>
> For such a young man Gary showed immense empathy[,] compassion and courage that day beyond his years. This was a horrific and distressing incident and I have always felt he should have had some therapy.
>
> Gary is a kind and extremely caring young man and I shall always be grateful to him for his support and bravery that day.

(Ex. 12: Letter of Valerie Pfeiffer at 1; see also Ex. 13: Letter of Zianna Pfeiffer at 1; Ex. 14: Letter of Glenn Cunningham at 1.)

Some of the letters are simply personal observations of family friends who have known Gary all his life. One example is family friend Gerry Carroll, who was "shocked when Gary was charged with this offense as it is totally out of character for him." (Ex. 15: Letter of Gerry Carroll at 1.) Despite this, Mr. Carroll still thinks "Gary is a good and very kind person," noting the "support he gave to his family during the most horrible crisis in their life with their son in law Rory taking his own life." (Id.)

As reflected in the attached letters, Gary has consistently gone out of his way to do special things that are important to others. Stephen Lemasney, a lifelong friend, writes:

> Gary is a much loved member of our local community and he brought joy and happiness into the life of everyone he met. To give an example, he would regularly go out of his way to provide transport to folks our local rural town who had no access to a car. On a more personal note, Gary is a kind, loyal, and dedicated friend whom I have always been able to rely on, in good times and in bad.

(Ex. 16: Letter of Stephen Lemasney at 1.) In a similar vein, Mylene Maillot, a former girlfriend of Gary's, wrote a letter from Spain, noting that, "Even after breaking up, he is a big part of my life and a friend I can count on, which is rare nowadays." (Ex. 17: Letter of Mylene Maillot at 1.)

The letters are replete with other examples of Gary going out of his way for others. For example, James Stafford is a glazing contractor who was a member of the Irish Defense Forces for 10 years and has known Gary for 15 years; he describes Gary as his best friend and provides a detailed and heartfelt picture of Gary as a friend there in the best and worst of times:

> Throughout our friendship Gary has always done everything in his power to help me and always had my best interests on his mind. W[h]ether it was to drive out to me in the middle of the night to help jump start my car or getting up at 4am in the morning to drive me to the airport so [I] could see my girlfriend while she was living in the [UK] he would be there for me. Always looking out for me and making sure everything was alright. Not just the physical things he would do for me but the things he would do that would help me mentally were what really stood out about Gary. Gary would spend many a night in my house sitting up and we would just talk for hours about everything. My mother passed away in 2009 and it is only in the last couple of years it has started to [affect] me mentally, that along with everything else going on in my personal life Gary would be always there to lend an ear and have a chat with me. Even now Gary still checks up on me and still makes sure everything is ok with me while he in custody awaiting trial. Although he cant do much he is still trying to make sure when he is done talking to you he has helped you in some way and that is the best thing about my friend and the reason [h]e is loved by so many people.
>
> Gary has the biggest heart out of anybody I know and what he has done for not just me but his family and all his friends too is truly breathtaking to see. He has always put everyone else's needs ahead of his own and he wears his heart on this sleeve. I can honestly say these last couple of months have been hell for me and [I've] been so lost without him. I can only imagine what his parents are feeling with him being so far away and not being able to see him and for so long. Gary is such a polite and caring man[.]
>
> I am fully aware that Gary has pleaded guilty to his crimes and the severity of this crime, Since Gary has been in custody I have talked to him many times and I can tell he has remorse what he has done. The crime Gary committed does not at all change the way [I] feel about him nor the respect [I] have for him. What he has done for me has been enormous and [I] will forever be in his debt.

(Ex. 18: Letter of James Stafford at 1.)

11

Multiple other individuals spoke of times Gary had come to their rescue when stranded or in need of rides both near and far. John Morrissey, a lifelong friend who considers Gary amongst his best friends writes: "The number of times he has had a positive impact on my life are innumerable, whether that be picking me up in the middle of the night when I had no way home, or simply being there to talk to during a tough time." (Ex. 19: Letter of John Morrissey at 1.) Patrick Mansfield, another friend who has known Gary over ten years, notes how "Gary has always been willing to help anyone out whenever he could, be it a lift home or someone to talk to. I distinctly recall a time I was unable to get home to Dublin from Wicklow. I had my dog with me so a taxi would not take me. I called Gary and he kindly offered to bring us home without hesitation." (Ex. 20: Letter of Patrick Mansfield at 1.)

Similarly, Mairead Fortune, notes how Gary provided her comfort when her sister, Niamh was diagnosed with cancer:

> Gary and I are in the same circle of friends. A lot of these friends I have been friends with from a very young age going back as far as three and four, preschool, yet still at this time one of the hardest things I've ever had to deal with in my life it was Gary's kind words and listening ears that helped me so much in dealing with my sister[']s illness. . . . I will be forever grateful to Gary for being there for me and my family when things weren't great.

(Ex. 21: Letter of Mairead Fortune at 1.) In her own letter, Niamh notes how Gary was always available without being asked to do things as small as taking the dog for a walk or bringing groceries when she was too ill to leave the house.  (Ex. 22: Letter of Niamh Fortune at 1.)

Georgia Doyle, another friend, described how Gary had helped her as she struggled with the untimely and tragic death of a close friend: "I had been isolated in my grief, but he reached out so sincerely that I didn't feel alone anymore. The manner in which he consoled me was truly moving, and something I have never forgotten." (Ex. 23: Letter of Georgia Doyle at 1.) Ms. Doyle describes another time where Gary had gone out of his way to help her out of a bind and then thoughtfully cheer her up with an ice cream just to put a smile on her face: "And that tells you everything about

Gary Davis you need to know. He would do anything to make sure the people around him are happy. And he would do anything to take the burden off someone else's shoulders." (Id.)

Rachel Jones met Gary when he dated a friend of hers and she remains close friends with Gary even though that relationship has ended; she notes: "Gary is a very supportive guy and has been someone that is always there to support anyone through difficult times. If you are to call Gary and to ask for advice or help, he is on the doorstep before you know it. He doesn't like to see anyone upset. Not only just being a support in the hard times Gary will get behind your ambitions and spur you on." (Ex. 24: Letter of Rachel Jones at 1.)

Although Gary is far from perfect and has room to grow, the attached letters demonstrate his fundamentally good nature and his ability to contribute much to his family, friends and society at large once he is released. These letters further demonstrate that Gary has a loving family, supportive friends and several jobs waiting for him when he returns to Ireland. Another person waiting for his return is his girlfriend, Amy Buggy, who is eager to make a life with Gary:

> I love Gary and would appreciate the chance to create a future with him at some point in our lives.  I struggle with my mental health and Gary has been a great help with getting me to where I need to be.  He is very wise and understanding.  I understand what Gary has done is very serious, but it does not in any way impact my judgement I have of him. I love Gary and cannot even begin to imagine a future without him in it.

(Ex. 25: Letter of Amy Buggy at 1.)

### 5.    Gary Has Made Extremely Productive Use of His Time While Incarcerated

Gary has been incarcerated at the Metropolitan Correctional Center—effectively a maximum-security prison—since July 2018. Gary has been a model inmate during these past 9 months, taking and completing more than 35 programs as part of the inmate education program—including classes in entrepreneurship, tutor training and re-entry into society (Ex. 26: Inmate

Education Data Transcript)—while not being cited or disciplined for any misconduct.[3] In addition, Gary has been reviewed positively for his work assignments as a unit sanitation orderly and a GED tutor. (Ex. 27: 3/4/19 Work Performance Rating.) In this recent review, his unit counselor noted:

> Mr. Davis has facilitated in tutoring the GED Classes for the Institution. He contributed a positive spin on the Classes and was chosen to take on a new responsibility by being an example to others. He consistently displays superior work ethic, communicates well with others, is proactive, and faces his challenges of his environment with grace and integrity.

(Id.) The supervisor further noted that Gary "also has been mentoring the youth on being positive and staying focused." (Id.) In recognition of Gary's assistance to the MCC's Education Department, the Supervisor of Education at the facility recently presented Gary with a "Certificate of Appreciation" for his "dedication and hard work in assisting the Education Department as a library clerk" and further noted how his "assistance in helping others achieve their education goals is greatly appreciated." (Ex. 28: March 2019 Certificate of Appreciation.) All of this helps demonstrate Gary's commitment to leading a productive and law-abiding life when he returns to Ireland.

## B.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

### 1.   Gary's Misconduct

From January 2011 until October 2, 2013, the website Silk Road served as a host for a bazaar of vendors that sold legal and illegal items over the internet. According to the government, approximately $183 million of illegal drugs were sold on Silk Road in that time frame. (PSR ¶ 15.) For about a month—from May 2013 to June 2013—Gary served as a forum administrator for Silk Road. In that role, Gary monitored discussion forums associated with Silk Road, provided guidance on how to conduct business on Silk Road and reported any significant problems discussed on the

---

[3] Gary has been waitlisted for participation in the MCC's drug treatment program and renown Focus Forward Program.

forums to Ross Ulbricht (Silk Road's owner and operator) and the site administrators. (Id. at ¶¶ 16–17, 53.)

In June 2013, Gary started working as a site administrator for Silk Road in June 2013, which included responding to customer support requests from users who needed assistance with their Silk Road accounts. (Id. at ¶¶ 17, 53.) This role also allowed Gary to investigate disputes between vendors and demote vendors for violating the site's rules (typically after reporting the violation to Ulbricht or co-defendant Andrew Jones—a high-level Silk Road employee who worked as a site administrator for a year). (Id. at ¶¶ 17, 54.) Gary remained in this role for a little more than three months, until law enforcement took down the site on October 1, 2013. After Silk Road ended, Gary worked for four weeks in 2013 as part of Silk Road 2.0 before his indictment in this case. (Id. at ¶ 18.)[4]

### 2. Gary Accepted Responsibility and Is Deeply Remorseful for His Conduct

As Gary's letter to this Court makes clear, he accepts full responsibility and is profoundly remorseful for his criminal conduct:

> I would like to begin by apologising both to the Court and to society at large for my wholly misguided behaviour, the consequences of which I will justly face in just a few short weeks. I understand that my actions were wrong, and I accept that I am fully responsible for both the actions themselves and the consequences that such acts must carry in a lawful society. I would like to apologise for the pain and suffering that has been brought about by Silk Road's existence, and for my part in that as an employee of Silk Road.

(Ex. 29: Letter of Gary Davis at 1.)

Because his remorse is genuine, Gary has discussed his feelings with his family and friends. As Jonathan Davis, Gary's older brother, has explained, after talking to Jonathan for "hours upon hours" over the course of Gary's proceedings, Jonathan is "100% certain that [Gary] wholeheartedly

---

[4] Gary worked at Silk Road 2.0 with co-defendant Peter Phillip Nash, who had served as the primary moderator on the original Silk Road's discussion forums from January to October 2013. (PSR ¶ 19.)

regrets these [actions] and is remorseful." (Ex 9: Letter of Jonathan Davis at 2.) Kyle Crinnion, a close friend who remained in contact with Gary throughout these proceedings, has noted that "when talking to him you could almost see the remorse in his eyes." (Ex. 30: Letter of Kyle Crinnion at 1.) Similarly, James Stafford, who describes Gary as his "best friend" and has known him for the last fifteen years, explained that he has spoken to Gary "many times" since he has been in custody, and he "can tell [Gary] has remorse [for] what he has done." (Ex. 18: Letter of James Stafford at 1.)

Many who wrote on Gary's behalf expressed their sincere view that Gary has learned from his mistakes and will never again transgress. Indeed, those closest to Gary, including his father, have indicated to the court that Gary "is very remorseful for what he has done, and the hurt he has caused . . . his family." (Ex. 5: Letter of John Davis at 2.) Ciaran Carraher, a friend of Gary's from high school, has remained in contact with Gary since he was first charged with these crimes, and has noted Gary's remorse since that time. (Ex. 31: Letter of Ciaran Carraher at 1.) Beyond his remorse, however, Ciaran believes that Gary is "older and wiser now" and can see that "things like this have real consequences on his life and the people around him." (Id. at 1.) Eoin Whitfield, a friend of Gary's for over ten years, explained:

> Having been in conversation with Gary over the past few years, I believe strongly that Gary has learned from all of this and regrets his actions deeply. I also believe that the chances of him stepping outside of the law again in the future are extremely unlikely.

(Ex. 32: Letter of Eoin Whitfield at 1.)[5]

## IV.   ANALYSIS

### A.   THE SENTENCE GUIDELINES IN THIS CASE OVERSTATE THE DEGREE OF GARY DAVIS' CULPABILITY

In United States v. Booker, 543 U.S. 220, 226 (2005), the Supreme Court held that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment. As a result, the Booker

---

[5] See Ex. 33 for 23 additional letters supporting Gary.

Court rendered the Sentencing Guidelines merely "advisory." Id. at 245. The Supreme Court has since reemphasized that the Guidelines are not to be presumed reasonable: "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. . . . The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." Nelson v. United States, 555 U.S. 350, 352 (2009) (citations omitted).

In this case, the parties and the Probation Department agree to a Level 35 Guidelines, which for an individual with a Category I criminal history corresponds to a Guidelines range of 168-210 months imprisonment. (PSR ¶ 138.) The overwhelming driving force increasing these Guidelines are the amount of drugs involved.[6] Yet, as noted by at least one District Judge in this District:

> the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective," tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.

United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff, D.J.) citing Kate Stith & José A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 69 (1998).

Moreover, Gary's conduct in this case lasted less than 5 months, yet he is facing more than 30 times that at the low end of the Guidelines. Even the Probation Department's 96-month recommended sentence is 20 times longer that Gary's criminal conduct. Although we appreciate that the length of criminal conduct should not always determine the length of a sentence, we ask this Court to consider that Gary's illegal conduct was only a very small portion of his otherwise law-abiding life.

---

[6] Base Offense Level of 36 (U.S.S.G. § 2D1.1(c)(2)) with a 2-level enhancement for mass-marketing by means of an interactive computer device (U.S.S.G. § 2D1.1(b)(7)) and a 3-level reduction for acceptance of responsibility (U.S.S.G. § 3E1.1(a), (b)). (PSR ¶¶ 88-98.) As Gary was only involved in Silk Road for a total of approximately 4.5 months, the vast majority of the amount of drugs that drive these Guidelines occurred before Gary joined the conspiracy.

Lastly, although Gary's conduct at Silk Road and Silk Road 2.0 was criminal, his actions do not reflect a criminal temperament. Rather, Gary was drawn to these sites because of his own drug abuse issues and because he felt comfortable interacting with others from behind the protection of a computer screen. In the years since his 2013 indictment, Gary has lived a crime-free life (outside of his personal drug use) and was meaningfully employed as a customer services manager at Bitcoin.com from 2016 until his June 2018 arrest in Ireland due to his extradition. (PSR ¶ 130.) This job, which is waiting for Gary when he returns to Ireland, allows him to again find comfort and purpose behind a computer screen but this time in a legal setting.

## B.    SENTENCING PARITY SUPPORTS A 30-MONTH SENTENCE

One of the 18 U.S.C. § 3553(a) considerations is sentencing parity with similarly situated defendants. In this case, Gary Davis was indicted with a co-defendant, Peter Philip Nash, who was sentenced by the late Judge Thomas P. Griesa in 2015 to 17 months of time served.[7] As noted in the PSR in this case, Nash worked as the forum moderator for Silk Road from January to October 2013, when the site was taken down, 10 months compared to Gary's five total. (PSR ¶ 19.) While Gary and Nash overlapped in this role (as Gary was a forum moderator for a month in May/June of 2013), the government's sentencing memo in the Nash case describes Nash as the "primary forum moderator" as that was "precisely how Ulbricht, the site operator, referred to" Nash. (Dkt. No. 35: Gov't Nash Sentencing Memo at 5 n.2.) Moreover, as with Gary, Nash also served as site administrator at Silk Road, albeit only for a "few weeks" (id. at 4 n.1) as opposed to the fifteen or so weeks that Gary served in that role. Additionally, Nash also worked with Gary at Silk Road 2.0 after the original site was taken down. (PSR ¶ 19.)

---

[7] Another co-defendant, Andrew Michael Jones, pleaded guilty pursuant to a cooperation agreement in October 2014 and is still awaiting sentencing.

We fully appreciate that the government views Nash as less culpable that Gary because Nash had a more minor role in the conspiracy and only served as a site administrator for a few weeks. (Gov't <u>Nash</u> Sentencing Memo at 3.)[8] We note, however, that both Gary and Nash provided information to the government as part of a Safety Valve proffer. Although Gary was open and honest with the government during his two days of proffering, the government ultimately found that Gary was not Safety Valve eligible because of his role as a site administrator in Silk Road. Despite serving in the same role for "a few weeks," the government nevertheless found Nash to be Safety Valve eligible.

Nevertheless, considering their differences, we do not request the same 17-month sentence. Rather, we request a 30-month sentence, which, as noted below, will result in 30 months of federal custody in, at best, a low-level facility because Gary is not a US citizen. This more severe sentence reflects the relative culpability between Gary and Nash while also considering Gary's overall culpability and mental health issues.

## C.   OTHER SENTENCING CONSIDERATIONS

As a non-citizen, Gary is not entitled to many of the ameliorative sentencing provisions available to U.S. citizens. Consequently, Gary would not be eligible for the 12-month sentence reduction through the RDAP drug-treatment program (even though Gary still suffered through drug dependency when extradited) or eligible to serve the last 9-12 months of his sentence on home confinement or half-way house. As a result, a 30-month sentence in this case would only be reduced by 15% for good time credit, leading to Gary spending approximately 25.5 months in prison. Given his ineligibility for these provisions, a 30-month sentence for Gary is the equivalent of a 55-month sentence for a similarly-situated U.S. citizen (i.e., 8.25 months off for good time credit, 12 months

---

[8] In evaluating relative culpability, we note that Nash did not choose to leave his role as site administrator but was rather demoted by Ulbricht. (<u>See</u> Gov't <u>Nash</u> Sentencing Memo at 4 n.1.)

off for RDAP and the last 9 months in a half-way house or on home confinement, leading to approximately 25.75 months in prison on a 55-month sentence). Moreover, as a non-U.S. citizen, Gary would not be eligible to serve his time in a federal camp facility.

Another consideration for the Court to consider is that Gary has already served 10 months of his sentence under the harsh conditions of the Metropolitan Correctional Center, a facility which several district judges have found to be particularly unsanitary. See United States v. Behr, No. S1 03CR1115-02 (RWS), 2006 WL 1586563, at *5 (S.D.N.Y. June 9, 2006) ("The MCC houses criminals of all types of offenses together in 26-bed dormitories. It is overcrowded, unsanitary, and lacks certain facilities."); see also id. (noting that "[r]ecently, the Honorable Kimba Wood reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at the MCC").[9]

In addition to the trying conditions of his detention, Gary's time in the MCC has been made even worse because his entire family lives in Ireland and cannot afford to fly to the U.S. on a frequent basis to visit with their son/brother. Though his parents hope to fly to the U.S. for Gary's sentencing, it is unlikely that Gary will have many visitors once he is assigned to a correctional facility to complete his sentence. That said, as noted above, Gary has tried to make the most of the difficult conditions by improving himself and preparing for a return to civilian life in Ireland.

Lastly, in imposing sentence, we ask the Court to consider that Gary was incarcerated in Ireland for nearly six weeks while challenging his extradition and that he will be deported back to Ireland once his sentence is completed.

---

[9] We believe this case to be United States v. Mendola, 03-CR-449 (KMW) (S.D.N.Y. 2005). Both the defendants in Behr and Mendola were housed in Unit-11 South in the MCC, the same unit where Gary is housed.

20

## V.     CONCLUSION

For the reasons set forth above, a sentence of 30 months is a fair and reasonable sentence given the specific § 3553(a) factors of this case.

Dated:  March 28, 2019

/s/ Marc Agnifilo
MARC AGNIFILO
JACOB KAPLAN
Brafman & Associates, P.C.

/s/ Brian Klein
BRIAN KLEIN
Baker Marquart LLP

*Attorneys for Gary Davis*